**This order is SIGNED.**



**Dated: July 10, 2019**

KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*slo*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| In re:<br><br>MICHAEL M. SMITH,<br><br>                  Debtor. | Bankruptcy Number: 17-22743<br><br>Chapter 7 |
| FIRST AMERICAN TITLE INSURANCE COMPANY and FIRST AMERICAN TITLE COMPANY, LLC,<br><br>                  Plaintiffs,<br>vs.<br><br>MICHAEL M. SMITH,<br><br>                  Defendant. | Adversary Proceeding No. 17-02076<br><br>Hon. Kevin R. Anderson |

MEMORANDUM DECISION FINDING THAT DEFENDANT'S DEBT TO
PLAINTIFFS IS NON-DISCHARGEABLE UNDER 11 U.S.C. § 523(a)(6)

In this adversary proceeding, the Debtor's former employer is seeking to except a pre-bankruptcy judgment from discharge as a "willful and malicious injury" under 11 U.S.C. § 523(a)(6). The complaint alleges that the Debtor caused injury to the Plaintiffs when he formed a competing title company by taking employees and customers from his former employer.

In December 2016 the United States District Court for the District of Utah held a three-week jury trial and on December 30, 2016 entered a judgment against Michael M. Smith in favor of First American for damages. Michael M. Smith filed a voluntary Chapter 7 bankruptcy petition on April 4, 2017.[1]

First American Title Insurance Company and First American Title Company, LLC (collectively "First American") filed a nondischargeability complaint against Michael M. Smith ("Smith" or "Debtor") alleging breach of fiduciary duty under 11 U.S.C. § 523(a)(4) and willful and malicious injury under § 523(a)(6).[2]

On April 3, 2019 the Court entered a Stipulated Pretrial Order.[3] In the Pretrial Order, First American agreed to voluntarily dismiss its first claim for non-dischargeability under § 523(a)(4). On April 16-19, 2019, the Court held a trial on the cause of action for willful and malicious injury under § 523(a)(6). The Court took the matter under advisement on April 19, 2019.

Having carefully considered the parties' oral and written arguments, the evidence and testimony presented at trial, and having conducted its own independent research of the relevant case law, the Court issues the following Memorandum Decision.[4]

## I.    JURISDICTION, NOTICE, AND VENUE

The Court's jurisdiction over this adversary proceeding is properly invoked under 28 U.S.C. § 1334(b) and § 157(a) and (b)(2).[5] First American's complaint objects to the discharge of

---

[1] Case No. 17-22743.

[2] All subsequent references to the United States Code are to Title 11 unless otherwise specified.

[3] Adv. No. 17-02076, ECF No. 35.

[4] This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052.

[5] The parties stated that the jurisdiction of the Court is not disputed in the Stipulated Pretrial Order. Adv. No. 17-02076, ECF No. 35.

particular debts, making this a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (I). Venue is

appropriately laid in this District under 28 U.S.C. § 1409.

## II.    FINDINGS OF FACT

### A.    Summary.

For many years, the Debtor worked as legal counsel for First American and its predecessor,

Equity Title. The Debtor became dissatisfied with First American, and took steps to form a new

title company – Northwest Title – to directly compete with First American. The Debtor concealed

these business formation activities from First American, including leasing new office space in

proximity to First American's offices and communicating with First American employees about

coming to work with him. Within days of resigning from First American, twenty-six employees

left First American and went to work with the Debtor and Northwest Title taking hundreds of

customers with them. These actions substantially disrupted First American's business operations

and resulted in financial injury.

### B.    Background.

1.      The Debtor is an attorney who practiced real property law from 1987 through 1993.

In 1993, he became General Counsel for Realty Title. Courtesy Title acquired Realty Title and the

Debtor became General Counsel for Courtesy Title. In 1995, Courtesy Title became Equity Title.[6]

2.      In 2004, the Debtor entered into an employment agreement with Equity Title

Insurance Agency, Inc. (the "Equity Employment Agreement").[7]

---

[6] See list of undisputed material facts in United States District Court for the District of Utah's decision granting in part First American's motion for summary judgment in *First Am. Title Ins. Co. v. Northwest Title Ins. Agency, LLC*, Case No. 2:15-cv-00229-DN, 2016 U.S. Dist. LEXIS 162893, at *9, ¶ 1, 2016 WL 6902473, at *4, ¶ 1 (D. Utah Nov. 23, 2016) (hereinafter "District Court Undisputed Facts at ¶").

[7] District Court Undisputed Facts at ¶ 2; Trial Exhibit 3.

3.      In the Equity Employment Agreement, the Debtor agreed to be employed to serve as Chief Operating Officer and General Counsel of Equity Title. As COO of Equity Title, the Debtor supervised all operations of Equity Title throughout Utah.[8]

4.      Under the Equity Employment Agreement, the Debtor was entitled to a base salary with yearly cost of living adjustment (COLA) increases for those calendar years in which Equity Title earned a pre-tax net income of 5% or greater.[9]

5.      Under the Equity Employment Agreement, the Debtor was entitled to bonuses based on Equity Title's pre-tax net income.[10]

6.      The Equity Employment Agreement contained a non-compete clause that would apply for one year, but only if the Debtor was terminated for cause.[11] The Debtor was aware that if he voluntarily quit, the non-competition clause would not apply.[12] However, the Debtor asserts this was not on his mind when he resigned from First American on March 9, 2015.[13]

7.      The Equity Employment Agreement also provides: "Notwithstanding the foregoing, nothing herein shall restrict Smith's right to practice law subsequent to the termination of his employment with Equity; provided, however, that Smith shall not be employed by any person or entity engaged in the title insurance business."[14]

8.      Between 2003 and 2006, Equity Title had approximately 150 employees and between 18 and 20 offices throughout Utah.[15]

---

[8] District Court Undisputed Facts at ¶ 4.
[9] District Court Undisputed Facts at ¶ 12.
[10] District Court Undisputed Facts at ¶ 14.
[11] Trial Exhibit 3.
[12] 04/16/2019 Hearing at 10:21:27 a.m. to 10:21:58 a.m.
[13] 04/16/2019 Hearing at 10:21:59 a.m. to 10:22:26 a.m.
[14] Trial Exhibit 3.
[15] District Court Undisputed Facts at ¶ 3.

9.      In September 2003, First American acquired a 25% ownership interest in Equity Title. First American acquired a further 25% ownership interest in Equity Title in March 2005. In December 2008, First American purchased an additional 45% ownership interest in Equity Title, making it the majority owner. First American acquired the remaining 5% ownership interest in Equity Title in February 2009, making it the sole owner.[16]

10.     After First American acquired a majority interest in Equity Title in 2008, it began managing Equity Title's back office functions such as payroll, accounting, and title plant operations.[17]

11.     After 2011, the Debtor was no longer Equity Title's General Counsel; he became State Underwriting and Legal Counsel.[18]

12.     As State Underwriting and Legal Counsel, the Debtor was to act as a lawyer for First American.[19]

13.     The Debtor recognized that he was a lawyer for First American and that First American was his client.[20] The Debtor also recognized that as its attorney, he owed a fiduciary duty and a duty of undivided loyalty to First American relating to the scope of his representation up until the time he resigned.[21]

14.     No one at First American complained to the Debtor about his legal work during the relevant time.[22]

---

[16] District Court Undisputed Facts at ¶ 5.

[17] District Court Undisputed Facts at ¶ 8.

[18] District Court Undisputed Facts at ¶ 9.

[19] District Court Undisputed Facts at ¶ 10.

[20] 04/16/2019 Hearing at 09:53:09 a.m. to 09:53:20 a.m.

[21] 04/16/2019 Hearing at 10:23:01 a.m. to 10:23:16 a.m.; 11:30:45 a.m. to 11:30:55 a.m.

[22] District Court Undisputed Facts at ¶ 11.

15.    As a lawyer, the Debtor understood the meaning and obligations of the non-compete and non-solicitation agreements in the Equity Employment Agreement.[23]

16.    In June of 2011, the Debtor sent an email to Mark Webber, Ray Whitney and Jeff Williams ("Williams") about a conversation he had with employee Mitch Montgomery, who had received an offer to work for another title company.[24] In the email, the Debtor states the following:

> My response was firm — I told him we were not in a position to offer him any more money, and that we would take him to the mat on the non-compete if he left for another title company. I told him he has done a nice job for us over the years, but I told him we have been more than fair with him. In response he wondered out loud if I thought the non-compete restriction would hold up given, in his words, "Equity is not the same company after First American took over." I responded that I absolutely believe the non-compete would be enforceable and that we would seek to enforce it if he leaves.

17.    Mitch Montgomery left First American in December 2011 to work for another title company and took five employees with him, but he was never sued by First American.[25]

18.    The Debtor avers that "[i]n May 2012, Kurt Andrewsen [First American's former Regional Human Resources Manager], told [him] that Equity was gone, that [his] Equity contract no longer existed, and asked [him] to sign an employment agreement with [First American] that contained, among other things, restrictive covenants regarding non-competition, non-solicitation, in favor of [First American]."[26]

19.    Kurt Andrewsen denies having told the Debtor that his Equity Employment Agreement no longer existed.[27]

---

[23] 04/16/2019 Hearing at 01:20:19 p.m. to 01:20:30 p.m.

[24] Trial Exhibit 17.

[25] 04/18/2019 Hearing at 09:12:31 a.m. to 09:13:17 a.m. (Mark Webber testified that he thought there were two employees that left with Mitch Montgomery); 03:23:52 p.m. to 03:24:08 p.m.; 03:24:35 p.m. to 03:24:50 p.m. (Michael Smith testified that five employees left with Mitch Montgomery); 03:26:51 p.m. to 03:27:17 p.m.

[26] District Court Undisputed Facts at ¶ 15.

[27] District Court Undisputed Facts at ¶ 16.

20.     The Debtor never specifically asked anyone at First American whether he was subject to the non-compete and non-solicitation provisions of the Equity Employment Agreement because he did not believe he needed to.[28]

21.     In May 2012, the Debtor refused to sign a new employment agreement with First American.[29]

22.     On October 12, 2012, Equity Title merged with First American Title Company, LLC.[30]

23.     The Debtor later signed the Utah Legal Counsel Production Bonus Plan, which "supersede[d] and replaced all previous production bonus plans, written or otherwise." [31]

24.     After signing the Utah Legal Counsel Production Bonus Plan, the Debtor received bonuses based on that plan. [32]

25.     By the time the Equity Title offices were rebranded as First American offices at the end of 2011, Equity Title had only seven offices located in Draper, Union Heights, Sugar House, West Jordan, Orem, South Ogden, and St. George. [33]

26.     In Utah, at the end of 2011, First American had at least 23 offices, located in Union Heights, Orem, South Ogden, Downtown Salt Lake City, Foothill Drive in Salt Lake City, American Fork, Bountiful, two in Union Park, Delta, Ephraim, Fillmore, Heber City, Layton, two in Park City, Richfield, South Jordan, St. George, and Cedar City. [34]

---

[28] 04/16/2019 Hearing at 10:01:30 a.m. to 10:01:40 a.m.
[29] District Court Undisputed Facts at ¶ 7.
[30] District Court Undisputed Facts at ¶ 6.
[31] District Court Undisputed Facts at ¶ 17; Trial Exhibit A.
[32] District Court Undisputed Facts at ¶ 18.
[33] District Court Undisputed Facts at ¶ 47.
[34] District Court Undisputed Facts at ¶ 48.

27.     Assuming that each First American office had four or five employees—First American had at least 100 employees in Utah. [35]

### C.     First American's Employee Handbook & Code of Ethics.

28.     First American employees are frequently required to look at online e-training, consisting of presentations and documents that employees are required to acknowledge online. [36]

29.     Among the documents which First American employees must open and acknowledge are the First American Employee Handbook (Employee Handbook), and the First American Code of Ethics and Conduct (Code of Ethics). [37]

30.     The Employee Handbook sets forth employee privileges and obligations, provides complaint protocol, and outlines consequences for failure to comply with the handbook, specifically discipline and termination. [38]

31.     When accessing the Employee Handbook employees receive a prompt that, at the end of a description of the privileges and obligations associated with the handbook, states, "By clicking 'I Acknowledge,' I confirm that I have read and agree to the terms noted above." [39]

32.     First American reserves the right to change any of the terms of the Employee Handbook at any time, without notice. When the Employee Handbook is revised employees are asked to review and agree to its terms again. [40]

---

[35] District Court Undisputed Facts at ¶ 49.

[36] District Court Undisputed Facts at ¶ 52.

[37] District Court Undisputed Facts at ¶ 53.

[38] District Court Undisputed Facts at ¶ 54; Trial Exhibit 15.

[39] District Court Undisputed Facts at ¶ 55; Trial Exhibit 16; 04/17/2019 Hearing at 04:01:09 p.m. to 04:02:03 p.m.

[40] District Court Undisputed Facts at ¶ 56.

33.     The acknowledgement of the Code of Ethics states that the employee has "read and understood the Code's contents" and that employees "are expected to know and abide by the [its] rules of ethical conduct." [41]

34.     The Debtor does not deny acknowledging the Employee Handbook and Code of Ethics. [42]

**D.     Setting up Northwest Title.**

35.     Discussions about forming Northwest Title began in 2014. Casey Willoughby ("Willoughby") was working as the Branch Manager of First American's Orem office. He contemplated leaving First American, and talked to Doug Smith about it at family events. Doug Smith—an attorney whose wife is a first cousin of Willoughby's wife—suggested that Willoughby start his own title business. [43]

36.     Doug Smith is not related to the Debtor. [44]

37.     Doug Smith and Clark Olsen ("Olsen") had no experience in the title and escrow industry. Nor did Willoughby have the knowledge and experience necessary to manage the operations of a title company. To move forward, they knew they would need to involve someone with experience running a title business. [45]

---

[41] District Court Undisputed Facts at ¶ 57; Trial Exhibit 16.
[42] District Court Undisputed Facts at ¶ 65; 04/19/2019 Hearing at 09:15:49 a.m. to 09:16:21 a.m. (Michael Smith could not recall, but did not deny acknowledging the Employee Handbook and Code of Ethics).
[43] District Court Undisputed Facts at ¶ 70.
[44] District Court Undisputed Facts at ¶ 71.
[45] District Court Undisputed Facts at ¶ 72.

38.    Willoughby arranged a meeting to introduce Doug Smith and Olsen to the Debtor, who was his colleague at First American. The first meeting occurred in early spring of 2014. Prior to that meeting, the Debtor had never met Doug Smith or Olsen. [46]

39.    At the meeting, the four men discussed the possibility of opening a title business. The idea was that Olsen would contribute capital and the Debtor would run the company. The Debtor expressed his interest in the proposed venture and agreed to consider it further. [47]

40.    Several months later, Willoughby called Doug Smith to inform him that the Debtor was interested in rekindling the discussions. At that point, having made the necessary introductions and expressed his desire to move forward, Willoughby left the details to the others.[48]

41.    A second meeting between the Debtor, Doug Smith, and Olsen took place in November or December of 2014 to discuss the possibility of opening a title business. Specifically, Doug Smith testified:

Q: Okay. And what did you discuss in that regard?

A: Primarily that day-to-day operations would be run by Mike [Smith], and Clark [Olsen] would contribute capital to the venture. [49]

42.    They also discussed that the owners of the business would include Doug Smith, Olsen, the Debtor, Willoughby, and Williams. At this time, the latter three individuals were employees of First American. [50]

---

[46] District Court Undisputed Facts at ¶ 73.

[47] District Court Undisputed Facts at ¶ 74.

[48] District Court Undisputed Facts at ¶ 75.

[49] District Court Undisputed Facts at ¶ 76.

[50] District Court Undisputed Facts at ¶ 77.

43.     They agreed upon the ownership of Northwest Title as follows: Olsen, 51%; the Debtor, 29%; Doug Smith, 10%; Williams, 5%; and Willoughby, 5%.[51]

44.     In October or November of 2014, the Debtor began communicating with Mike Koloski (Koloski) of Westcor Land Title Insurance Company (Westcor), who was a long-time acquaintance.[52]

45.     Westcor is a national title insurance underwriter that competes with First American.[53]

46.     The Debtor informed Koloski that he was interested in starting his own title company under the name of Northwest Title. The two began working to formalize a relationship so that Northwest Title could become a title insurance issuing agent for Westcor.[54]

47.     The Debtor, Doug Smith, and Olsen met again in January 2015. At that meeting, they discussed the terms of an operating agreement and the ownership percentages that each owner of Northwest Title would have.[55]

48.     Forming a new title company required the creation of an underwriting relationship between Northwest Title and First American's competitor, Westcor. Part of that process involved the submission of personal information forms by any owner or employee who would have signature authority on escrow accounts.[56]

---

[51] District Court Undisputed Facts at ¶ 78.

[52] District Court Undisputed Facts at ¶ 79.

[53] District Court Undisputed Facts at ¶ 79.

[54] District Court Undisputed Facts at ¶ 80.

[55] District Court Undisputed Facts at ¶ 81.

[56] M. Koloski Dep. at 29:15–30:8; 04/17/2019 Hearing at 08:55:41 a.m. to 08:56:26 a.m.

49.     On January 8, 2015, Willoughby submitted his personal information form to Koloski at Westcor. Willoughby sent the form using his personal email account, stating: "Mike Smith asked me to fill this out and return to you."[57]

50.     In January 2015, the Debtor arranged a meeting to introduce Williams and Casey Buhler, his long-time administrative assistant at First American, to Doug Smith.[58]

51.     During that meeting, Doug Smith presented Williams with a draft operating agreement and they discussed Williams' ownership percentage in Northwest Title. The participants also discussed things they were working on and tasks they had been assigned to move forward with creating Northwest Title.[59]

52.     On January 17, 2015, and while still employed as legal counsel for First American, the Debtor signed a Westcor "Regional Agency Application" for Northwest Title and submitted it to Westcor.[60] The Debtor signed the application as "President/Manager" of Northwest Title and the "Primary Application Contact."[61] It listed the owners of Northwest Title and their respective ownership percentages as follows: Olsen with a 51% ownership share; the Debtor with a 29% ownership share; Doug Smith with a 10% ownership share; and Williams and Willoughby each with a 5% ownership share. The application also listed the Debtor, Williams, Willoughby, and Casey Buhler as employees of Northwest Title.[62] The Regional Agency Application is dated

---

[57] Trial Exhibit 47.

[58] District Court Undisputed Facts at ¶ 82.

[59] District Court Undisputed Facts at ¶ 83.

[60] Trial Exhibit 49; District Court Undisputed Facts at ¶ 85, 86.

[61] *Id*.

[62] *Id*.

January 17, 2015, which was almost two months before any of these individuals left First American.[63]

53.     On January 19, 2015, Doug Smith emailed the Westcor personal information forms for himself and Olsen to Koloski, writing: "This is Doug Smith – working with Mike Smith to set up Northwest Title in Salt Lake City, UT."[64] Koloski forwarded those forms to his administrative assistant with the following note: "two more for the Mike Smith group."[65]

54.     Starting around January 27, 2015, Koloski used the email account of Ruth Smith, the Debtor's wife. Sometimes Koloski intended the email for Ruth Smith to pass on information to the Debtor and sometimes to directly communicate with the Debtor about setting up Northwest Title.[66]

55.     This was done to avoid using the Debtor's First American email account, and to avoid First American learning of the Debtor's activities in setting up Northwest Title.[67]

56.     The Debtor knew that First American would be upset if it became aware that he was setting up a competitor title company.[68]

57.     Around the same time, Doug Smith filed a Certificate of Organization on behalf of Northwest Title with the Utah Department of Commerce.[69]

---

[63] *Id.*

[64] Trial Exhibit 50.

[65] *Id.*

[66] Trial Exhibit 54; 04/16/2019 Hearing at 10:30:30 a.m. to 11:19:27 a.m.

[67] District Court Undisputed Facts at ¶ 101; 04/16/2019 Hearing at 10:31:22 a.m. to 10:32:44 a.m.; 11:32:16 a.m. to 11:32:31 a.m.

[68] 04/16/2019 Hearing at 10:32:45 a.m. to 10:33:24 a.m.

[69] District Court Undisputed Facts at ¶ 87; Trial Exhibit 52.

58.    On January 26, 2015, the registration was approved, and Northwest Title was certified to do business. [70]

59.    On January 28, 2015, Koloski prepared a "Write Up for Mike Smith Northwest Title" as part of Westcor's agency application process.[71] The document details the prospective relationship between Northwest Title and Westcor. In response to a question about Northwest's customer base, Koloski wrote: "Tihis [sic] agecny [sic] has a very strong reltionship [sic] with the major producers of Coldwell Banker Real Estate Agents."[72]

60.    As to why Westcor should approve Northwest as its agent, Koloski's wrote:

The individuals within this start up operation have been major employees of First American in the Salt Lake City area for over 20 years . . . IT WILL BE A MAJOR PROBLEM FOR FIRST AMERICAN . . . when they open their doors . . . it is estimated that this agncy [sic] will secure at least 40% of the Coldwell Bank business from First American within the first year . . . Coldwell Banker has been a major customer of First American for many years in Salt Lake and the surrounding area . . . I have known Mike Smith for over 15 years . . . he has a solid background in Title, Escrow and Underwriting this agency will be a welcomed addition to our network of agents in Utah.[73]

61.    On February 3, 2015, Northwest Title obtained the domain name "NWTitleUtah.com."[74]

62.    By February 4, 2015, Northwest Title had signed a lease for its corporate Sugar House office. The Debtor negotiated the lease, and Doug Smith signed it.[75]

63.    Northwest Title's Sugar House office was in the building next door to First American's Sugar House office. [76]

---

[70] District Court Undisputed Facts at ¶ 88; Trial Exhibit 52.

[71] Trial Exhibit 56.

[72] *Id*.

[73] *Id*. (emphasis in original.)

[74] Trial Exhibit 62.

[75] District Court Undisputed Facts at ¶ 90.

[76] District Court Undisputed Facts at ¶ 91.

64.    In an email to Westcor on February 5, 2015, Koloski reported:

Several key employees of First Americans direct operation in Salt Lake are leaving
and taking several Realtor customers with them. Including the large Coldwell
Banker operation. This is a start up but all employees have over 20 years of
experience. Mike Smith who will act as President has been Underwriting Counsel
for FA for 20 years. They plan on opening within the next three weeks. . . . This
breakaway from First American will be Big News in Utah and a great opportunity
for Westcor.[77]

65.    Northwest Title applied with the state of Utah for its title escrow and title search

licenses on February 7, 2015.[78]

66.    On February 18, 2015, the following events occurred:

a.    The Utah Insurance Department approved Northwest Title's application and

issued the licenses.[79]

b.    Westcor and Northwest Title entered into an Issuing Agency Agreement,

which was signed by the Debtor on behalf of Northwest Title.[80]

c.    The Debtor, while still employed as legal counsel for First American,

became the agent of Northwest Title for insurance licensing purposes.[81]

d.    Koloski wrote in an email to the Debtor: "We have a new agent in Utah …

Northwest Title … Mike Smith, President." [82]

e.    The Debtor replied, "Please wait a few days to appoint us if there is a chance

someone will see it."[83]

---

[77] Trial Exhibit 65.

[78] District Court Undisputed Facts at ¶ 93; Trial Exhibit 67.

[79] District Court Undisputed Facts at ¶ 94; Trial Exhibit 78.

[80] District Court Undisputed Facts at ¶ 95; Trial Exhibit 68.

[81] Adv. No. 17-02076, ECF No. 35 (Stipulated Pretrial Order), Uncontroverted Facts, ¶ 5.

[82] District Court Undisputed Facts at ¶ 97; Trial Exhibit 82

[83] District Court Undisputed Facts at ¶ 98; Trial Exhibit 82.

f.    The Debtor made that request because he did not want First American to discover that he was involved with Northwest Title.[84]

g.    Koloski responded, "Just let me know when you [w]ant us to 'Appoint' you."[85]

67.    On February 23, 2015, Koloski wrote to the Debtor: "Since you are giving your notice on Wednesday at 5:00pm...we will go ahead and 'Appoint: you with the State that afternoon … no one should know unless they actually search for Northwest Title on the site."[86] The Debtor responded:

> We are planning to secure a "landing space" for our offices in Bountiful and Union Park. They won't be ready for action until late next week. Because we want to limit the time between when I exit and when the others could come, we are pushing back the date for me leaving until sometime next week. I will keep you posted with updates. I am sure it is okay for you to appoint us at any time though.[87]

68.    The Debtor wanted to limit the time between when he resigned and when other First American employees could start at Northwest so as to maximize the chance that First American employees would come to work for Northwest and to minimize the opportunity for First American to try and keep the employees at First American.[88]

69.    On February 28, 2015, the Debtor wrote to Koloski:

> We are doing well. Our title guy starts tomorrow, so we have at least that in place. Actually, we have a lot in place. Our main office space is ready to go. I am still working on a critical issue on the space we are trying to tie down in Union Heights . . . I am not yet ready to leave that group behind without getting them in the barn.[89]

---

[84] District Court Undisputed Facts at ¶ 98.

[85] Trial Exhibit 82.

[86] Trial Exhibit 84.

[87] *Id.*

[88] 04/16/2019 Hearing at 11:39:41 a.m. to 11:40:43 a.m.; 11:49:06 a.m. to 11:49:36 a.m.; 01:16:50 p.m. to 01:17:15 p.m.

[89] District Court Undisputed Facts at ¶ 92; Trial Exhibit 90.

70.     On March 3, 2015, Williams prepared the Schedule of Minimum Charges for Escrow Services that Northwest Title needed to file with the Utah Department of Insurance. He used his First American computer to complete the form, then e-mailed it to his wife's personal account so another employee of Northwest Title could file it. [90]

71.     On March 4, 2015, Koloski sent the following email to Westcor: "Northwest Title, Mike Smith … mass exodus from First Am … next week."[91]

**E.      The Debtor's Beliefs Regarding His Employment Relationship with First American.**

72.     In preparing to leave First American, and in forming Northwest Title as a competitor to First American, the Debtor engaged in the following analysis and alleges that he formed the following beliefs regarding his employment relationship with First American.

73.     The Debtor believed that with the transition from Equity Title to First American, coupled with the changes to his job responsibilities and his compensation, that: (1) the Equity Employment Agreement was no longer binding; and (2) that he did not have an employment agreement with First American.

74.     The Debtor drew these conclusions based on the following:

a.      When Mitch Montgomery went to work for another title company, taking two employees with him, he was not sued. This reinforced the Debtor's belief that he likewise did not have an employment agreement with First American. [92]

b.      While the Debtor did not specifically research issues regarding the status of his employment relationship with First American in light of the merger with Equity

---

[90] District Court Undisputed Facts at ¶ 102.
[91] Trial Exhibit 96.
[92] 04/19/2019 Hearing at 08:55:22 a.m. to 09:00:53 a.m.

Title, he based his understanding on his own knowledge of the law and his experience as a title company lawyer;[93]

c.    The Debtor had discussions about these issues with Doug Smith. Doug Smith consulted with the law firm of Wood Balmforth on the status of the Debtor's employment agreements with First American and the propriety of the Debtor leaving First American and forming Northwest Title. The Debtor understood from Doug Smith, who understood from Wood Balmforth, that the Equity Employment Agreement was unenforceable.

d.    However, the Debtor did not meet with anyone at Wood Balmforth before his departure from First American,[94] and neither Doug Smith nor Wood Balmforth were the Debtor's attorney.[95] Further, there is no evidence that Doug Smith provided Wood Balmforth with copies of any of the relevant documents, including the Equity Employment Agreement, the First American Handbook and the First American Code of Ethics.

75.    Nonetheless, the Debtor knew that First American would not be happy with him leaving to start Northwest and that a lawsuit was coming.[96]

76.    The Debtor was aware that if he resigned from First American, the non-compete provision in the Equity Employment Agreement would not apply.[97]

---

[93] 04/16/2019 Hearing at 01:31:50 p.m. to 01:32:42 p.m.

[94] 04/16/2019 Hearing at 01:17:17 p.m. to 01:17:58 p.m.

[95] 04/17/2019 Hearing at 02:17:23 p.m. to 02:17:52 p.m. (Testimony of Doug Smith).

[96] 04/16/2019 Hearing at 01:41:40 p.m. to 01:42:03 p.m.

[97] Trial Exhibit 3 at ¶ 7.

**F.    The Debtor Resigns from First American.**

77.    On Friday, March 6, 2015, Koloski sent the Debtor the following email: "Mike Good Luck today....we did get Brandon all set up on ewestcor [sic].........I will talk with you on Monday........Great Job .,..on getting all you [sic] employees to join you." [98]

78.    Mark Webber ("Webber") and the Debtor have known each other twenty years and worked together for many years at Equity Title and First American. [99]

79.    On Monday, March 9, 2015, Webber was in a weekly management meeting at First American's Sugarhouse office. The Debtor intentionally missed the meeting, [100] but Williams was there. During the meeting, Webber learned of Northwest Title, and he asked those at the meeting whether they knew anything about Northwest Title. Williams said nothing, left the meeting, and texted the Debtor that Webber knew about Northwest. [101]

80.    After this meeting, the Debtor arrived at the First American office and informed Webber that he was resigning. Webber did not initially connect the Debtor's resignation with the news about Northwest. When Webber asked where he was going, the Debtor only said he was considering his options, and that he didn't want to talk about it. [102]

81.    Webber told the Debtor that if he was going to work for a competitor, it would be a problem. [103]

---

[98] Trial Exhibit 100.

[99] 04/16/2019 Hearing at 03:25:26 to 03:25:36.

[100] 04/18/2019 Hearing at 03:43:20 p.m. to 03:43:32 p.m.

[101] 04/16/2019 Hearing at 10:19:44 a.m. to 10:20:05 a.m.; 04/17/2019 Hearing at 04:17:08 p.m. to 04:17:46 p.m.

[102] 04/17/2019 Hearing at 04:18:43 p.m. to 04:19:17 p.m.

[103] 04/18/2019 Hearing at 03:47:36 p.m. to 03:47:40 p.m.; 04/19/2019 Hearing at 09:25:06 a.m. to 09:25:21 a.m.; 09:57:14 a.m. to 09:57:36 a.m.

82.    Later that day, Webber learned that the Debtor was the president of Northwest. When Webber confronted him about this, the Debtor again said that he did not want to talk about it, and he left the First American offices. The Debtor testified that he was trying to avoid a confrontation with Webber.[104]

83.    The Debtor testified that he did not definitively decide to resign from First American "until he walked out the door."[105]

84.    Mark Webber testified that if he had known of the Debtor's involvement with Northwest, that he would have immediately fired him.[106]

85.    The afternoon of his resignation, the Debtor sent emails to various First American employees informing them of his departure.[107]

86.    Upon resigning, the Debtor took First American documents.[108]

87.    The Debtor's assistant, Buhler, helped him gather those documents.[109]

88.    When the Debtor resigned from First American, he left no project undone which had an imminent deadline, and First American had other lawyers who were also handling, or were capable of handling, regulatory matters.[110]

89.    On March 10, 2015, Northwest opened its offices in Bountiful and Sugar House.[111]

---

[104] 04/19/2019 Hearing at 09:25:35 a.m. to 09:25:49 a.m.
[105] 04/16/2019 Hearing at 10:10:35 a.m. to 10:10:59 a.m.
[106] 04/17/2019 Hearing at 04:09:53 p.m. to 04:10:25 p.m.
[107] Trial Exhibits 203, 207, and 208.
[108] District Court Undisputed Facts at ¶ 20.
[109] District Court Undisputed Facts at ¶ 21.
[110] District Court Undisputed Facts at ¶ 22.
[111] 04/16/2019 Hearing at 02:10:05 p.m. to 02:10:30 p.m.

90.     Williams and Carrell resigned on March 10, 2015, just one day after the Debtor.
Williams and Carrell immediately began working for Northwest Title.[112]

91.     On the same day that Williams and Carrell resigned, ten other employees left First
American, including the following individuals:[113]

    a.     Elizabeth Cole, an Escrow Officer in the Sugar House office;

    b.     Claire Drew, an Escrow Assistant in the Sugar House office;

    c.     Darcy Gliko, Branch Manager and an Escrow Officer in the Bountiful
        office;

    d.     Charlotte Christensen, an Escrow Officer in the Bountiful office;

    e.     Melinda Conlin, an Escrow Assistant in the Bountiful office;

    f.     Angie Dastic, an Escrow Officer in the Bountiful office;

    g.     Angela Flint, an Account Manager in the Bountiful office;

    h.     Kimberly Muhlestein, an Escrow Assistant in the Bountiful office;

    i.     Kirk Walton, an Escrow Assistant in the Bountiful office; and

    j.     Willoughby, Branch Manager and an Escrow Officer in the Orem office.

92.     Then, between March 11 and March 23, 2015, fourteen more employees left First
American, including the following individuals:[114]

    a.     Diane Mouser, an Account Manager in the Sugar House office;

    b.     McInsy Brown, an Escrow Officer in the Sugar House office;

    c.     Teresa Lenzi, Branch Manager and an Escrow Officer in the Union Heights
        office;

---

[112] Adv. No. 17-02076, ECF No. 35 (Stipulated Pretrial Order), ¶ 9.

[113] *Id.*

[114] *Id.* at ¶ 10.

d.     Andrew Cartwright, an Account Manager in the Union Heights office;

e.     Melissa Troske, an Escrow Assistant in the Union Heights office;

f.     Shelley Reed, a Receptionist in the Union Heights office;

g.     Candice Porter, an Escrow Assistant in the Union Heights office;

h.     Geraldine Jensen, an Escrow Officer in the Union Heights office;

i.     Judd Williams, an Escrow Officer in the Union Heights office;

j.     Roberta Dyer, an Escrow Assistant in the Union Heights office;

k.     Jeremy Bawden, Branch Manager and an Escrow Officer in the Draper office;

l.     January Stark, an Escrow Officer in the Draper office;

m.     Terrie Lund, an Account Manager in the Draper office; and

n.     Shane Perkins, Branch Manager and an Escrow Officer in the South Ogden office.

93.     In summary, twenty-eight First American employees left in March of 2015 to join the Debtor at Northwest Title.[115]

94.     Mark Webber estimated that the departing employees represented 300 years of title experience.[116]

95.     Immediately after joining Northwest Title, the former First American employees began contacting First American's customers exclaiming, for example, that the "whole office

---

[115] District Court Undisputed Facts at ¶ 103.
[116] 04/17/2019 Hearing at 04:20:31 p.m. to 04:21:41 p.m.

switched companies"; "[t]he whole office went ;-)"; or "we've all switched title companies" and "are located in the bldg. next to where we were with First American."[117]

96.    Geraldine Jensen promised: "New name same great customer service." [118]

97.    Others, like Elizabeth Cole, added that "[w]e are transferring everything over here" and "I still plan to close your deal (we have all of the info)." When one customer asked Cole what happened, she responded that "Mike Smith left FATCO and started his own company" and "[m]ost people followed." [119]

98.    As a result, less than three weeks after opening its doors, Northwest already had "600 orders" with Westcor. Koloski characterized getting that many customers in such a short period of time as "getting slammed." [120]

99.    Northwest Title profited from at least 150 transactions that were opened at First American but later closed at Northwest. [121]

100.    Nearly every Northwest Title employee deposed testified that a majority of his or her customers at Northwest Title were his or her customers from First American. [122]

101.    One Northwest Title Sales Manager, Diane Mouser, bragged on Facebook that 95% of First American's former Sugar House customers left for Northwest Title. [123]

---

[117] District Court Undisputed Facts at ¶ 105.

[118] District Court Undisputed Facts at ¶ 106.

[119] District Court Undisputed Facts at ¶ 107.

[120] District Court Undisputed Facts at ¶ 108; Trial Exhibit 140.

[121] District Court Undisputed Facts at ¶ 109.

[122] District Court Undisputed Facts at ¶ 110. *See also* Trial Exhibit 161 (list of former First American customers that went to Northwest Title).

[123] District Court Undisputed Facts at ¶ 111.

### G.   First American Sues the Debtor, and the Debtor's Email Comments Regarding First American and the Lawsuit.

102.     On April 3, 2015, First American filed an action in the United States District Court, District of Utah, Civil No. 2:15-cv-00229 (the "District Court Litigation") against the Debtor and others for, among other things, breach of contract, tortious interference with contract, breach of fiduciary duty, misappropriation of trade secrets, and unfair competition.[124]

103.     After First American filed the law suit, the Debtor made the following statements in emails:

      a.     In an email dated April 14, 2015, the Debtor said to Koloski about First American:

> They are idiots. They would be smart just to make the best of what they have left here in Utah and move on. But they are not smart. Instead, they threaten lawsuits and file a lawsuit, which only unifies us here at Northwest Title and also turns clients against them. In the meantime, we are rocking and rolling, and undeterred by their shallow accusations and general innuendo. We have some of the best employment law specialists in the state representing us. We are in good hands and not worrying about it. In contract, the whole thing is Webber's obsession right now.[125]

      b.     In an email dated April 14, 2015, the Debtor said to an associate about his departure from First American:

> I am honestly not paying attention to W[ebber] or his crusade to defame me and sue me (and others). If he were very smart, and those of us know him well know he is not, he would just rally around what is left at FA and make the most of it. By doing what he is doing, he only alienates clients, former employees (now here), and even current employees who aren't "yes" men and women and who are smart. We win all around.[126]

---

[124] Adv. No. 17-02076, ECF No. 35 (Stipulated Pretrial Order), ¶ 11.
[125] Trial Exhibit 143.
[126] Trial Exhibit 142.

c.       In an email dated May 1, 2015, the Debtor told a friend,

> 25 of us ended up leaving First American. We now have 35 employees and 5 offices. Needless to say, it was a crazy month, but we have settled in. First American didn't like it, or course, so they sued. I fully expected that going in, so we were ready. They don't have much if any ground to stand on. They were just pissed because their company is dumb and those who left just wanted to go back to a better professional life. They don't want to admit it or do anything about it in terms of local and regional management. All is good.[127]

d.       In an email on May 19, 2015, the Debtor said, "First American does not like us, but I don't care – I don't like FA either (never did)."[128]

e.       In an email on June 24, 2015, discussing alleged retaliation by First American, the Debtor said, "That is just the way First Am rolls. They suck as a company."[129]

f.       On June 29, 2015, the Debtor emailed some of the former First American employees that went with him to Northwest Title talking about reporting First American to the Utah regulatory authority for teaching two continuing education classes to the Salt Lake Board of Realtors:

> I am somewhat embarrassed as to the level of enjoyment I took out of drafting and sending the email below [about alleged regulatory violations by First American]. But I am confessing that to you. Amazingly, I ran into Matt Sager at Costco on Saturday. He was quite civil, but strangely he told me that he is very busy with regulatory issues in Texas, Washington, and Utah. So it looks like FA still has trouble here, in spite of the myFirstAm stipulation and fine, and hopefully this will only add fuel to the regulators' fire. May FA burn in regulatory hell! Sorry, but I am feeling it good people![130]

---

[127] Trial Exhibit 147.

[128] Trial Exhibit 149.

[129] Trial Exhibit 150.

[130] Trial Exhibit 151.

### H.    First American Prevails Against the Debtor in the District Court Litigation.

104.    In the District Court Litigation, Judge Nuffer made the following conclusions of

law in connection with First American's motion for summary judgment.

a.    The Debtor's Equity Employment Agreement remained in force after the

Equity Title/First American merger in 2012.[131]

b.    The Debtor breached the non-solicitation provision in his Equity

Employment Agreement because as an owner of Northwest, he "directed numerous [First

American] employees to Doug Smith, who later hired them on behalf of Northwest."[132]

c.    The Debtor's "non-compete agreement could only be triggered "if

terminated" by First American. . . . Smith was not terminated by First American."

Therefore, the Debtor did not breach the non-compete provision of his Equity Employment

Agreement.[133]

105.    In a subsequent motion for summary judgment, Judge Nuffer made the following

additional conclusions of law.

a.    First American did not materially breach the Debtor's Equity Employment

Agreement.[134]

b.    The enforceability of the Debtor's Equity Employment Agreement is not

barred by an increase in its geographic scope.[135]

---

[131] *First Am. Title Ins. Co. v. Northwest Title Ins. Agency, LLC*, Case No. 2:15-cv-00229-DN, 2016 U.S. Dist. LEXIS 144561, at *40, 2016 WL 6091540, *14 (D. Utah Oct. 18, 2016).

[132] *Id.* 2016 U.S. Dist. LEXIS 144561, at *36-37.

[133] *Id.* at *40.

[134] *First Am. Title Ins. Co. v. Northwest Title Ins. Agency, LLC*, Case No. 2:15-cv-00229-DN, 2016 U.S. Dist. LEXIS 162893, at *7, 2016 WL 6902473, at *3 (D. Utah Nov. 23, 2016).

[135] *Id.*

c.      The First American Confidential Information and Inventions Agreement is

not void for unconscionability, and the Employee Handbook and the Code of Ethics are

enforceable, unilateral contracts and are not illusory.[136]

106.    Following the December 2016 trial, the jury found that the Debtor received and had

knowledge of the relevant terms of the Employee Handbook and the Code of Ethics.[137]

107.    The jury found that the Debtor breached the three contracts – (1) the non-

solicitation provision of the employment agreement he entered into with First American's

predecessor in interest, Equity Title; (2) the Employee Handbook; and (3) the Code of Ethics. For

the Debtor's breaches of contract, the jury awarded $500,000 in compensatory damages.[138]

108.    The District Court found that the Debtor had a fiduciary duty to First American

while employed by First American, the jury found that he breached that fiduciary duty, and that

there was clear and convincing evidence that his breach of fiduciary duty was willful and

malicious, or in knowing and reckless indifference toward, and disregard of, the rights of First

American. The jury awarded $600,000 in compensatory damages for this breach.[139]

109.    The jury found that the Debtor tortiously interfered with First American's contracts,

other than his own contracts, and that there was clear and convincing evidence that such tortious

interference was willful and malicious, or in knowing and reckless indifference toward, and

disregard of, the rights of First American. The jury awarded $525,000 in compensatory damages

for this breach.[140]

---

[136] *Id.*

[137] Adv. No. 17-02076, ECF No. 1 (Complaint), Exhibit A (Special Verdict). Although the Special Verdict-Phase I was not included in First American's exhibits at trial, the Court finds that the Special Verdict's contents are not reasonably subject to dispute and the Court will therefore take judicial notice of the Special Verdict attached to the complaint pursuant to Fed. R. Evid. 201.

[138] Adv. No. 17-02076, ECF No. 35 (Stipulated Pretrial Order, ¶ 12.

[139] *Id.* at ¶ 13.

[140] *Id.* at ¶ 14.

110.    The jury found that the Debtor was acting as an agent of Northwest Title when he breached his fiduciary duty to First American. The jury found that Northwest Title tortiously interfered with First American's contracts and that such tortious interference was willful and malicious, or in knowing and reckless indifference toward, and disregard of, the rights of First American. The jury awarded $1,000,000 in compensatory damages for such breach.[141]

111.    In addition to the $1,625,000 in compensatory damages against the Debtor, and the $1,000,000 in compensatory damages against Northwest Title, the jury awarded an additional $100,000 in compensatory damages against the other defendants, Williams and Carrell. The jury also awarded $500,000 in punitive damages against Northwest Title. The Court entered judgment on such amounts on December 30, 2016.[142]

112.    The Court granted an award of attorneys' fees and costs to First American and against the Debtor and others in the amount of $3,097,816.36.[143]

113.    Williams paid $99,500 to First American towards his compensatory damages obligation, which amount First American accepted as satisfaction of the judgment against him. Carrell satisfied the judgment against her by paying approximately $100,000 to First American. To date, the Debtor has involuntarily paid $2,662.06 toward his obligations to First American, which First American obtained from him by garnishment.[144]

114.    On appeal, the Tenth Circuit Court of Appeals affirmed the District Court's finding that the Debtor's Equity Employment Agreement was still in effect when he resigned from First

---

[141] *Id.* at ¶ 15.
[142] *Id.* at ¶ 16.
[143] *Id.* at ¶ 17.
[144] *Id.* at ¶ 18.

American on March 9, 2015.[145] The Tenth Circuit also affirmed all other aspects of the District Court's findings and judgment against the Debtor.[146]

115.    On or about April 4, 2017, Debtor filed a voluntary petition for relief in this Court under Chapter 7 of the Bankruptcy Code.[147]

## III.    DISCUSSION

### A.    The Preclusive Effect of the District Court Litigation.

Before proceeding it is necessary to address the preclusive effect of the District Court Litigation on this nondischargeability action. "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"[148] Issue and claim preclusion "protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.'"[149] "Federal common law governs the preclusive effect of a judgment of a federal court sitting in diversity."[150] "The 'federally prescribed rule of decision' to determine the preclusive effect of a diversity court's judgment is 'the law that would be applied by state courts in the State in which the federal diversity court sits.'"[151] In this case, the findings of fact arose from the United States District Court for the District of Utah sitting in diversity. Therefore, the Court will apply Utah law on claim and issue preclusion.[152]

---

[145] *First Am. Title Ins. Co. v. Northwest Title Ins. Agency*, 906 F.3d 884, 891 (10th Cir. 2018).

[146] *Id.* at 900.

[147] Case No. 17-22743.

[148] *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

[149] *Id.* (quoting *Montana v. U.S.*, 440 U.S. 147, 153-54 (1979)).

[150] *Clark v. Zwanziger*, 741 F.3d 74, 77 (10th Cir. 2014) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)).

[151] *Id.*

[152] *Id.*

Under Utah law, "[c]laim preclusion bars a party from prosecuting in a subsequent action a *claim* that has been fully litigated previously."[153] However, in *Brown v. Felsen* the Supreme Court held that claim preclusion does not prevent the creditor or the debtor from presenting additional evidence in a bankruptcy adversary proceeding under § 523.[154]

On the other hand, issue preclusion "corresponds to the facts and issues underlying causes of action."[155] Issue preclusion "prevents parties or their privies from relitigating *facts and issues* in the second suit that were fully litigated in the first suit."[156] For issue preclusion to apply under Utah law, the following four elements are required: "(i) the party against whom issue preclusion is asserted must have been a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication must be identical to the one presented in the instant action; (iii) the issue in the first action must have been completely, fully, and fairly litigated; and (iv) the first suit must have resulted in a final judgment on the merits."[157]

Because this adversary proceeding involves the same parties and arises from the same set of operative facts as the District Court Litigation, the requirements of issue preclusion are met. Thus, this Court is bound by the findings of fact and law made in the District Court Litigation, and as affirmed by the Tenth Circuit Court of Appeals.[158] Further, while the causes of action in the

---

[153] *Oman v. Davis Sch. Dist.*, 194 P.3d 956, 965 (Utah 2008) (emphasis in original) (citing *Snyder v. Murray City Corp.*, 73 P.3d 325 (Utah 2003)).

[154] *Brown v. Felsen*, 442 U.S. 127, 138 (1979). *See also In re Tsamasfyros*, 940 F.2d 605, 606 (10th Cir. 1991) ("[T]he Supreme Court held that, insofar as *res judicata* is concerned, a bankruptcy court is not confined to a review of the judgment and record in a prior state court proceeding when determining the dischargeability of a debt and that when a debtor asserts a new defense of bankruptcy, *res judicata* does not bar the creditor from offering additional evidence to meet that defense.").

[155] *Oman v. Davis Sch. Dist.*, 194 P.3d 956, 965 (Utah 2008).

[156] *Id.* (citing *Snyder v. Murray City Corp.*, 73 P.3d 325, 332 (Utah 2003)).

[157] *Oman*, 194 P.3d at 965 (citation omitted).

[158] See *First Am. Title Ins. Co. v. Northwest Title Ins. Agency, LLC*, Case No. 2:15-cv-00229-DN, 2016 U.S. Dist. LEXIS 144561, 2016 WL 6091540 (D. Utah Oct. 18, 2016); *First Am. Title Ins. Co. v. Northwest Title Ins.*

District Court Litigation (breach of contract, breach of fiduciary duty, and tortious interference with contracts) are different than First American's nondischargeability claim, the prior findings are nonetheless relevant to the elements of First American's cause of action under § 523(a)(6).[159]

> *1.    The Preclusive Effect of the District Court Litigation on the Existence of First American's Injuries and the Amount of the Debt.*

In its Trial Brief, First American argues that the Debtor is estopped from re-litigating the validity or amount of his debt owing to First American. The Court agrees. This nondischargeability action arises from the same conduct at issue in the District Court Litigation; namely, the Debtor's formation of Northwest Title and his "poaching" of employees and customers from First American.

The existence of an injury to First American and the amount of the Debtor's liability to First American was established by a final judgment in the District Court Litigation in the following amounts and for the following causes of action: (1) $500,000 in compensatory damages for the Debtor's breach of the Equity Employment Agreement and the First American Employee Handbook and Code of Ethics;[160] (2) $525,000 in compensatory damages for the Debtor's tortious interference with First American's contracts (other than those involving the Debtor);[161] and (3) $600,000 in compensatory damages for the Debtor's breach of fiduciary duty.[162]

---

*Agency, LLC*, Case No. 2:15-cv-00229-DN, 2016 U.S. Dist. LEXIS 162893, 2016 WL 6902473 (D. Utah Nov. 23, 2016); *First Am. Title Ins. Co. v. Northwest Title Ins. Agency*, Case No. 17-4086, 906 F.3d 884 (10th Cir. 2018).

[159] See *WLC Enters., Inc. v. Rylant (In re Rylant)*, 594 B.R. 783, 788 (Bankr. D. N.M. 2018) (prior state court findings of breach of contract were relevant in deciding nondischargeability action under § 523(a)(6)); *Oman v. Davis Sch Dist.*, 194 P.3d 956, 966 (Utah 2008) ( "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.") (citations omitted).

[160] Adv. No. 17-02076, ECF No. 35 (Stipulated Pretrial Order), at ¶ 12.

[161] *Id.* at ¶ 14.

In addition, the District Court awarded First American the following in attorney fees and costs: (1) $88,006.44 for Defendant's breach of fiduciary duty; (2) $2,802,344.52 for Defendant's breach of contract; and (3) $250,771.27 in costs.[163] Thus, the District Court awarded First American $1,625,000 in total compensatory damages and $3,141,122.23 in total attorney's fees and costs, for a grand total of $4,766,122.23.

Based on the preclusive effect of the District Court Litigation,[164] the Court finds that for purposes of § 523(a)(6), the Debtor's actions caused a quantifiable injury to First American in the total amount of $4,766,122.23.[165]

> ### 2. The Preclusive Effect of the Jury's Findings on the Legal Elements of This Adversary Proceeding.

The jury found that the Debtor breached his fiduciary duty as First American's legal counsel. However, this does not give rise to a cause of action under § 523(a)(4) for breach of fiduciary duty. This is because § 523(a)(4) requires an express or technical trust rather than the more general duty that exists in an attorney-client relationship.[166] Indeed, First American ultimately dropped its cause of action under § 523(a)(4).

Next, the jury found that there was clear and convincing evidence that the Debtor's breach of fiduciary duty was willful and malicious, or in knowing and reckless indifference toward, and in disregard of, the right of First American.[167] " The phrases "willful and malicious" and "knowing

---

[163] Adv. No. 17-02076, ECF No. 40 (Plaintiff's Trial Brief).

[164] *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 584–85 (10th Cir. 1995) (affirming that "res judicata precluded the bankruptcy court from redetermining the amount of [the creditor's] damages."); *Sanders v. Crespin (In re Crespin)*, 551 B.R. 886 (Bankr. D. N.M. 2016) (in non-dischargeability action, res judicata precluded bankruptcy court from revisiting amount of state court damage award).

[165] As set forth more fully below, this amount does not include any accrued interest or First American's attorney's fees and costs in prosecuting this adversary proceeding.

[166] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1372 (10th Cir. 1996).

[167] Adv. No. 17-02076, ECF No. 35 (Stipulated Pretrial Order), at ¶13.

and reckless indifference" appear to be in reference to Utah's punitive damages statute at U.C.A. § 78B-8-201[168] rather than an attempt to have the jury make findings that would exclude this debt from discharge under § 523(a)(6). Indeed, the disjunctive "or" in the finding thwarts a collateral estoppel finding of willful and malicious injury under § 523(a)(6) because if the jury based its finding on reckless indifference, this is insufficient for purposes of a § 523(a)(6) action.[169]

Nonetheless, because First American's claims against the Debtor in this bankruptcy case arise from the same conduct that was tried in the District Court, this Court can consider the factual underpinnings for each damage award in determining if First American has met its burden of proof under § 523(a)(6).[170]

Plaintiff further argues that the Court should not limit its analysis to the specifics of the District Court causes of action because all of the damage awards arose from the same conduct that gives rise to this nondischargeability action. This is consistent with *Brown v. Felsen*,[171] and the Court agrees that if the individual damage awards arose from the same conduct that is found to be

---

[168] U.C.A. § 78B-8-201(1)(a): "[P]unitive damages may be awarded only if . . . it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others."

[169] See e.g., *Diamond v. Vickery (In re Vickery)*, 526 B.R. 872, 880 (D. Colo. 2015) (jury's finding that debtor acted in reckless disregard of a creditor's rights did not meet the standard for a willful and malicious injury under § 523(a)(6)); *Tso v. Nevarez (In re Nevarez)*, 415 B.R. 540, 546 (Bankr. D. N.M. 2009) ("Non-dischargeability under 11 U.S.C. § 523(a)(6) was not intended to cover reckless or negligent behavior.") (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998)).

[170] *WLC Enters. v. Rylant (In re Rylant)*, 594 B.R. 783, 788 (Bankr. D. N.M. 2018) ("[T]he form of the [prior] judgment itself does not control and resort may be had to the entire record to determine dischargeability . . . and the theory of recovery—tort or contract—is immaterial.") (citation omitted). See also *Moraes v. Adams (In re Adams)*, 761 F.2d 1422, 1427 (9th Cir. 1985) ("[T]he exception to discharge turns upon the nature of the act which gave rise to the liability rather than upon the nature of the liability.").

[171] 442 U.S. 127, 138-39 (1979) (finding that the "bankruptcy court is not confined to a review of the judgment and record in the prior state-court proceedings when considering the dischargeability of respondent's debt.").

willful and malicious under § 523(a)(6), then the constituent parts of the entire damage award are nondischargeable.[172]

### B.    The Tenth Circuit Standard for Willful and Malicious Injury.

Section 523(a)(6) excepts from discharge a debt arising from the "willful and malicious injury by the debtor to another entity or to the property of another entity." The purpose of this section is to preclude the discharge of claims arising from a debtor's tortious conduct that resulted in harm to persons or property.[173] For First American to prevail, it must establish by a preponderance of the evidence that the Debtor's actions constituted both a willful act <u>and</u> a malicious injury.[174] As explained above, the Court has already found that First American was injured as a result of the Debtor's actions. Thus, the dispositive issue is whether those injuries were willful and malicious under § 523(a)(6).

### 1.    The Meaning of Willful.

The purpose of requiring proof of a willful act is to preserve the distinction between willful conduct and injurious conduct that is only reckless or negligent.[175] The concept of willful under § 523(a)(6) is "akin to the standard of deliberate injury necessary for an intentional tort."[176] The

---

[172] *Spring Works, Inc. v. Sarff (In re Sarff)*, 242 B.R. 620 (B.A.P. 6th Cir. 2000) (damage awards arising from various causes of action found by state court were all nondischargeable under § 523(a)(6) because they all arose from the same set of willful and malicious facts).

[173] 4 Collier on Bankruptcy ¶ 523.12[1] (16th ed. rev. 2019) ("Section 523(a)(6) generally relates to torts and not to contracts. By its terms, it may apply to a broad range of conduct causing harm to people or property, subject to the limitation that the injury be 'willful and malicious.'").

[174] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of [a willful act and malicious injury] . . . an objection to discharge under [§ 523(a)(6)] must fail.").

[175] *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998) (in a nondischargeability action based on a medical malpractice claim, the Court held "that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."). *See also* Restatement (Second) of Torts § 8A (1979), comment b (noting that as the certainty of injury decreases, the action descends through the spectrum of being malicious, to merely reckless, to ordinary negligence).

[176] *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651, 656 (B.A.P. 10th Cir. 1999).

Tenth Circuit has held that "to constitute a willful act under § 523(a)(6), the debtor must 'desire .

. . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially

certain to result from it.'"[177] The Eight Circuit has explained that willful conduct is "headstrong

and knowing,"[178] and that a willful injury is "a deliberate or intentional invasion of the legal rights

of another."[179]

In this case, the evidence establishes that the Debtor's actions were headstrong, knowing,

and done with the intent to create a title company that would directly compete with First American

by poaching First American's employees and customers and by opening offices in the same

location as First American's offices. But this finding of willfulness does not *ipso facto* lead to a

conclusion that the Debtor acted maliciously.

2.    *The Meaning of Malicious.*

Determining a debtor's malicious intent is sometimes implicit in the nature of the actions,

such as when a debtor assaults an individual during an altercation. But in cases involving tortious

business activity, a malicious intent is seldom conceded. More often, debtors assert a pure profit

motive, and that any injury was merely incidental to the conduct of aggressive but legitimate

business activities. So to extract a finding of malicious intent from an inherent profit motive, the

Court may indirectly infer intent from all of the facts and circumstances of the case.[180] Further, the

---

[177] *Moore*, 357 F.3d at 1129 (citing to *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (B.A.P. 10th Cir. 1999)) (quoting Restatement (Second) of Torts § 8A (1965)).

[178] *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 881 (8th Cir. 1985).

[179] *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 852 (8th Cir.1997), *aff'd*, 523 U.S. 57.

[180] See *Nat'l Labor Relations Bd. v. Gordon (In re Gordon)*, 303 B.R. 645, 656 n.2 (Bankr. D. Colo. 2003) (noting that in a § 523(a)(6) action, "[a] court will rarely, if ever, have before it direct evidence of an individual's intent. Consequently, it is not only permissible, but necessary, to divine intent from indirect evidence.") (citations omitted).

Supreme Court[181] and the Tenth Circuit[182] have adopted the definition of intent found in Restatement (Second) of Torts § 8A (1979), which is that "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." This definition is augmented by the comment to the Restatement:

> All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. **If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.**[183]

In the context of a § 523(a)(6) action, the Eight Circuit explains that malicious conduct is "targeted at the creditor ('malicious') at least in the sense that the conduct is certain or almost certain to cause financial harm."[184]

While some courts apply an objective standard[185] in determining whether the debtor had the requisite knowledge or belief to satisfy the substantial-certainty-of-harm test, the Tenth Circuit, in an unpublished decision,[186] has held that the focus should be on the debtor's subjective knowledge or belief:

> [The objective standard proposed by the Fifth Circuit] denies the purely subjective dichotomy of desire/belief actually set out in § 8A [of the Restatement (Second) of Contracts], and ignores the history of intent jurisprudence encapsulated in the

---

[181] *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998).

[182] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004).

[183] Restatement (Second) of Torts § 8A (1979), comment b (emphasis added).

[184] *In re Long*, 774 F.2d 875, 881 (8th Cir. 1985).

[185] *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998) ("[W]e hold that an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm.").

[186] While unpublished, the *Englehart* decision has been cited by almost every bankruptcy court in the Tenth Circuit in support of applying the subjective standard. *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, No. 99-3339, 2000 U.S. App. LEXIS 22754, at *8, 2000 WL 1275614, at *3 (10th Cir. Sept. 8, 2000); *see Burris v. Burris (In re Burris)*, 598 B.R. 315, 334 (Bankr. W.D. Okla. 2019); *Armstrong v. Oslin (In re Oslin)*, 584 B.R. 363, 372 (Bankr. N.D. Okla. 2018); *Reperex, Inc v. May (In re May)*, 579 B.R. 568, 593 (Bankr. D. Utah 2017); *Davis v. Arellano (In re Arellano)*, 574 B.R. 251, 258 (Bankr. D. N.M. 2017); *Ally Fin. Inc. v. Matthew (In re Matthew)*, 2016 Bankr. LEXIS 2588, at n.16, 2016 WL 3947882, at n.16 (Bankr. D. Kan. July 13, 2016); *Medical Lien Mgmt. v. Cain (In re Cain)*, No. 14-cv-01200, 2014 U.S. Dist. LEXIS 159161, at *8 (D. Colo. Nov. 12, 2014).

pertinent illustration to that section. See Illustration 1 to § 8A ("A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by [A's act]. A is subject to liability to C for an intentional tort."). *Miller* fails to appreciate that **the notion of subjective substantial certainty extends the scope of intent well beyond the compass of evil motive, without extending it to [sic] so far as to include consequences entirely outside the actor's ken**, which would be contrary to the whole thrust of the Supreme Court's decision in *Geiger*.

In sum, the "willful and malicious injury" exception to dischargeability in §523(a)(6) turns on **the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur**. When injury was "neither desired nor in fact anticipated by the debtor," it is outside the scope of the statute.[187]

Lastly, a "[w]illful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property. . . . or indirectly by evidence of both the debtor's knowledge of the creditor's . . . rights and the debtor's knowledge that the conduct will cause particularized injury."[188]

Thus, for First American to prevail on its § 523(a)(6) action, the Court must find by a preponderance of the evidence that (1) the Debtor subjectively wished to have caused the particularized injury to First American (i.e., the damages resulting from the formation of Northwest Title and the poaching of First American's employees and customers); or (2) the Debtor subjectively believed that such injury was substantially certain to occur, with the understanding that the subjective, substantial certainty test "extends the scope of intent well beyond the compass of evil motive, without extending it to so far as to include consequences entirely outside the actor's ken. . . ."[189]

---

[187] *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, No. 99-3339, 2000 U.S. App. LEXIS 22754, at *7, 2000 WL 1275614, at *3 (10th Cir. Sept. 8, 2000) (emphasis added) (citing *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 603-04 (5th Cir. 1998); *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998)).

[188] *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (B.A.P 10th Cir. 1999).

[189] *Englehart*, No. 99-3339, 2000 U.S. App. LEXIS 22754, at *8, 2000 WL 1275614, at *3.

**C.      Application of the Findings of Fact to the Tenth Circuit Standard for Willful and Malicious Injury.**

Applying the standards articulated above to the findings of fact made by the District Court and adduced during the bankruptcy court trial, the Court finds as follows: (1) the Debtor acted with a willful intent to form Northwest Title to directly compete with First American and to conceal these actions from First American; (2) the Debtor acted with a willful intent to hire a significant number of First American employees, with their expertise and customer contacts, to work for Northwest Title; (3) the Debtor did these acts with the subjective knowledge that these actions, which resulted in the immediate loss of a significant number of First American employees and customers, were substantially certain to result in the particularized harm actually suffered by First American; and (4) thus, the Debtor willfully and maliciously injured First American. The Court bases its finding of willful and malicious injury on the following factors.

> *1.      The Jury's Finding of Tortious Interference Included a Finding that the Debtor Desired to Bring About Harmful Consequences to First American.*

The jury found that the Debtor "tortiously interfered with First American's contracts."[190] To prevail on this cause of action, First American had to establish "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff."[191] The "intent" requirement for tortious interference is satisfied by a showing of the defendant's desire to bring about the resulting consequences:

> [O]bviously, tortious interference remains an intentional tort. Intent and motive are not synonymous; in the tort context, **"intent" means a desire to bring about certain consequences**, not a person's reasons for that desire. *See* Restatement (Second) of Torts § 8A (1965) ("The word 'intent' is used throughout the

---

[190] Adv. No. 17-02076, ECF No. 35 (Stipulated Pretrial Order), ¶14.

[191] *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015).

Restatement of this Subject to denote that the actor desires to cause consequences of his act . . . .")[192]

Based on the preclusive effect of the jury's finding on tortious interference with contracts, the Court finds that the Debtor intended to bring about harmful financial consequences to First American.

> 2.    *The Debtor Intentionally Concealed from First American the Formation of Northwest Title and His Intent to Hire Away First American Employees and Customers.*

During the bankruptcy court trial, First American established that the Debtor took steps to conceal his involvement in the formation of Northwest Title. The Debtor admitted using his wife's email account to communicate with Koloski to avoid detection by First American. So that his involvement would be less visible, the Debtor coordinated with Doug Smith, Williams, and Willoughby, who took the laboring oar to obtain lease space, office equipment, and make other arrangements for the opening of the Northwest offices. The Debtor also had surreptitious discussions with First American employees about job opportunities with Northwest but directed them to Doug Smith to handle the employment offers.

The Debtor emailed Koloski and asked him to wait a few days to be appointed with Northwest "if there is a chance someone will see it."[193] Koloski responded: "Just let me know when you [w]ant us to 'Appoint' you."[194] Later, Koloski said he would appoint the Debtor because "no one should know unless they actually search for Northwest Title on the [web] site."[195] When the Debtor resigned, he declined to disclose to Mark Webber where he was going. Even after Mark Webber learned that the Debtor was president of Northwest, the Debtor refused to talk to him about

---

[192] *Id.* (citation omitted) (emphasis added).

[193] Trial Exhibit 82.

[194] *Id.*

[195] Trial Exhibit 84.

his plans with Northwest. Mark Webber testified that if he had known of the Debtor's actions to form Northwest, he would have immediately fired him.

The Debtor's concealment of his business activities supports a finding of malicious intent. In *Global Control Sys., Inc. v. Luebbert (In re Luebbert)*,[196] the debtor secretly set up a company to compete with his employer and used his inside information to outbid his employer on jobs. The employer found out, and the parties entered into a settlement agreement that the debtor later breached. As a result of the breach, a jury awarded damages against the debtor. The debtor filed for bankruptcy, and the employer brought a § 523(a)(6) action. The debtor defended that a breach of contract could not be a basis for a § 523(a)(6) action, and that he never subjectively intended to harm his employer. The court noted that it was not limited to the findings on the breach of contract action, especially when the debtor knew that his breach would certainly deprive his employer of income.[197] The court also declined to accept the debtor's testimony on this point given that the debtor secretly set up a company to compete with his employer, that he was not "straightforward in his resignation letter," and that he hid his actions and intentions: "[The debtor] did not offer any credible reason for these secretive and evasive actions, all of which seem designed to hide the fact he was intending to go forward and take away [his employer's] customer."[198] Based on this and similar findings regarding the debtor's concealment of his outside business activities while working for his employer, the court found that the debtor had committed a willful and malicious injury.

The Court finds Debtor's secretive actions and lack of credible explanation in this case similar to the actions of the Debtor in *In re Luebbert*. Therefore, the Court finds that the Debtor

---

[196] 595 B.R. 314 (Bankr. W.D. Mo. 2018).

[197] *Id*. at 331-32.

[198] *Id*. at 332.

intentionally concealed his Northwest business formation activities for the following reasons: (1) the Debtor knew his actions were inconsistent with his legal and ethical duties to First American as its counsel; (2) the Debtor knew that First American would view his actions to set up Northwest as a threat because of the impact on First American's business and reputation; and (3) the Debtor knew he had to keep his plans secret from First American so he could take twenty-seven employees before First American could respond in a meaningful way to retain such employees.

3.    *The Debtor's Business Plan for Northwest Title Contemplated Hiring Away a Number of First American Employees with Considerable Expertise and Customer Contacts.*

The evidence establishes that it was the Debtor's intent to have First American's employees transition with him to Northwest to staff the new offices and to provide an immediate influx of clients and title work. Consistent with this intent, twenty-seven First American employees followed the Debtor to Northwest Title after his resignation from First American. As found by the District Court, these actions constituted a breach of the non-solicitation provision[199] in the Equity Employment Agreement because the Debtor "directed numerous [First American] employees to Doug Smith, who later hired them on behalf of Northwest."[200]

As expressed in an email to Koloski, the Debtor talked about a "landing space" for the Northwest Bountiful and Union Park offices, and that he would delay his departure from First American because "we want to limit the time when I exit and when the others could come."[201] In another email to Koloski, the Debtor talked about completing the lease for the Union Heights office

---

[199] Trial Exhibit 3 at ¶ 8: "Non-solicitation. During his employment with Equity, and for a period of one (1) year thereafter, Smith, on behalf of himself or any other person or entity, shall not hire, attempt to hire, recommend for hire, or employ, directly or indirectly, any employee of Equity. During this one-year period of time, Smith shall not encourage or induce any employee of Equity to resign from Equity or assist any other employer in recruiting or hiring any employee away from Equity."

[200] Findings of Fact ¶ 103b.

[201] Trial Exhibit 84.

because "I am not yet ready to leave that group behind without getting them in the barn."[202] Finally, three days before his resignation, Koloski congratulated the Debtor "on getting all you[r] employees to join you."[203] Two days after his resignation, the Debtor reported to Koloski regarding his success at getting employees to follow him: "25 in the barn as of tonight. 4 more anticipated by the first of next week. A good day. I can feel the lawsuit coming."[204] This last sentence establishes that the Debtor knew of the potential legal consequences of poaching First American's employees.

Mark Webber estimated that the departing employees represented 300 years of title experience. Koloski reported that within the first few weeks of opening, "Northwest Title has 600 orders that they are working, and they are just getting slammed."[205] Because essentially all of the Northwest employees came from First American, the Court finds that these 600 orders represent work that would otherwise have been done by First American. As previously noted, all of the Debtor's efforts to attract and hire First American's employees was done in a way to keep it hidden from First American. This evidence strongly supports the Court's finding of malicious intent.

    4.    *The Debtor Located the Northwest Title Business Offices in Proximity to Existing First American Business Offices.*

The Court also finds indicia of a malicious intent from the curious fact that the Debtor set up the main Northwest office in Sugar House right next door to First American's office. The Debtor and Northwest also set up offices in Draper, Bountiful, Union Heights, and Orem, which is where First American likewise had offices. Further, the First American employees who went to work for Northwest remained in their same business locations working for Northwest. This

---

[202] Trial Exhibit 90.

[203] Trial Exhibit 100.

[204] Trial Exhibit 119.

[205] Trial Exhibit 140.

establishes the Debtor's intent to simply transfer the employees and business from these First American office locations to the corresponding Northwest office locations.

> 5.    *The Debtor Subjectively Knew that His Actions Were Substantially Certain to Cause Harm to First American.*

Most significant is that a preponderance of the evidence establishes that the Debtor subjectively knew there was a substantial certainty that his actions would harm First American. In June 2011, an employee approached the Debtor about a job offer he had received from another title company. The Debtor told the employee that "we would take him to the mat on the non-compete if he left for another title company."[206] The employee raised an issue similar to the Debtor's defense that the employment contract with Equity Title was not enforceable because of the merger with First American. The Debtor responded that he "absolutely believe[d] the non-compete would be enforceable and that [First American] would seek to enforce it if he leaves."[207] This statement belies the Debtor's assertion that he believed his Equity Employment Agreement was no longer binding on him, and establishes that he understood the ramifications of title company employees leaving to work for competitors – and even more so when leaving to set up a new title company to directly compete with one's former employer.[208]

As an experienced title attorney, the Debtor was also well aware of the damage to the reputation and operation of a title company if its ability to close transactions was disrupted. In a declaration filed in the District Court Litigation, the Debtor articulated the damages if the District Court enjoined Northwest Title from doing business.[209] The Debtor stated that shutting its doors,

---

[206] Trial Exhibit 17.

[207] *Id.*

[208] The Court is aware that because the Debtor resigned, he was not subject to the non-compete provision in his Equity Employment Agreement. However, as found by the District Court, he was subject to the non-solicitation provision therein that precluded him from hiring away First American employees.

[209] Trial Exhibit 221.

even temporarily, would not only would have a negative effect on Northwest's cash flow, but it would result in irreparable harm to its reputation. The Debtor said this would effectively be a death sentence in that Northwest would not be able to open its doors again because customers would not "want to risk doing business with a company that can't keep its doors opened (or had them shut), regardless of the reason."[210]

When questioned about his declaration, the Debtor was evasive as to whether he knew taking twenty-seven employees, including six branch managers, and their customer contacts would result in a similar harm to First American. But the Debtor ultimately conceded that unless First American was able to quickly replace the twenty-seven employees, it would result in an injury. The Debtor suggested that the harm to First American from the loss of employees would be a sliding scale, such that the loss of a few employees would not result in harm.[211] But the evidence establishes that the Debtor intended to bring at least twenty-seven First American employees to Northwest Title,[212] so his rationalization about a sliding scale of harm is not relevant. Thus, the Debtor subjectively knew that taking a large number of First American's employees was substantially certain to disrupt and impair First American's ability to conduct business at its various locations. Further, the Debtor subjectively knew that the loss of hundreds of customers was substantially certain to result in an economic harm to First American – and this is exactly what happened.

In addition, when Koloski was explaining to Westcor why it should approve Northwest as an agent, he revealed that its start up would involve "major employees of First American . . . for over 20 years," and that "IT WILL BE A MAJOR PROBLEM FOR FIRST AMERICAN . . . when

---

[210] *Id.* at ¶ 3g.

[211] 04/19/2019 Hearing at 09:21:14 a.m. to 09:23:31 a.m.

[212] 04/16/2019 Hearing at 10:14:26 a.m. to 10:16:14 a.m.

they open their doors." Koloski further said that Northwest would secure "at least 40% of the

Coldwell Bank business from First American within the first year" and that "Coldwell Banker has

been a major customer of First American for many years."[213] Koloski testified that he did not know

if the Debtor knew this would be the consequence of starting Northwest Title.[214] However, the

Debtor had to be Koloski's main source of information about First American's market share,

employees, and customers, and the Court finds it extremely unlikely that the Debtor and Koloski

did not discuss the impact on First American of starting a competing title company. Therefore, the

Court finds this to be indirect evidence of the Debtor's subjective knowledge that the opening of

Northwest Title by taking First American employees and customers was substantially certain to

harm First American.[215]

Finally, the Debtor's responses to First American's difficulties and the subsequent lawsuit

against the Debtor and other Northwest employees also establishes that the Debtor knew of the

substantial certainty of harm to First American and the potential for a lawsuit as a result of such

harm. They also evidence the Debtor's attitude of retribution against First American. A few days

after his resignation, the Debtor reported his success at soliciting so many First American

employees to follow him and said, "I can feel the lawsuit coming."[216] A few weeks later, First

American indeed sued the Debtor. When asked about the lawsuit, the Debtor responded that he

was not paying attention to Mark Webber and that "[i]f he were very smart, and those of us who

know him well know he is not, he would just rally around what is left at FA and make the most of

---

[213] Trial Exhibit 56 (emphasis in original).

[214] 04/17/2019 Hearing at 09:27:44 a.m. to 09:28:43 a.m.; Trial Exhibit 222 at p. 80-81.

[215] *Nat'l Labor Relations Bd. v. Gordon (In re Gordon)*, 303 B.R. 645, 656 n.2 (Bankr. D. Colo. 2003) (in a § 523(a)(6) action, a court may divine a debtor's intent from indirect evidence).

[216] Trial Exhibit 119.

it."[217] In other emails, he said First American "are idiots" and that they should just "make the best of what they have left here in Utah and move on."[218] To his accountant, he reported his departure from First American and said they were not happy with him, but that "they had their chances to do something different over the years, and they chose not to do that."[219] To an attorney friend, he reported the lawsuit and said, "I fully expected that going in, so we were ready. They don't have much if any ground to stand on. They were just pissed because their company is dumb . . . ."[220] A few weeks later, the Debtor said he never liked First American[221] and that First American "suck[ed] as a company."[222] Lastly, the Debtor reported First American to a state regulatory agency for conducting too many presentations at a customer's location. After reporting First American, the Debtor commented, "I am somewhat embarrassed as to the level of enjoyment I took out of drafting and sending the email below. . . . May [First American] burn in regulatory hell! Sorry, but I am feeling it good people!"[223]

Many of these statements were made after First American sued the Debtor, so he was understandably angry. But they nonetheless establish the Debtor's feelings of animosity to First American, and that he was neither surprised nor sorry about the injury to First American from his formation of Northwest Title.

In the similar case of *Patriot Fire Prot., Inc. v. Fuller (In re Fuller)*,[224] the debtor had worked for ten years in the fire safety industry. He initially did side jobs for customers without his

---

[217] Trial Exhibit 142.

[218] Trial Exhibit 143.

[219] Trial Exhibit 145.

[220] Trial Exhibit 147.

[221] Trial Exhibit 149.

[222] Trial Exhibit 150.

[223] Trial Exhibit 151-152.

[224] 60 B.R. 881 (Bankr. N.D. Ga. 2016).

employer's knowledge. Later, after he was fired, he solicited business away from his former

employer. In a resulting lawsuit, the state court found that the debtor had breached a non-compete

clause and awarded damages. The debtor filed for bankruptcy and the employer filed a § 523(a)(6)

action. The bankruptcy court noted that while the state court made no finding of willful and

malicious injury, sufficient facts were presented at trial to establish that the debt was excepted

from discharge:

> First, the Debtor's conduct was malicious—there was no just cause for him to
> breach the [non-compete] Agreement, and to do so was wrongful. Second, the
> Debtor acted with the substantial certainty that his conduct would cause injury to
> Patriot. The Debtor had worked in the fire-protection industry for nearly ten years
> before the events at issue here, and therefore would have understood how precious
> each client is to a business engaged in that industry, and how poaching clients
> necessarily caused harm to Patriot in that the client would no longer need Patriot's
> services.[225]

In the present case, the Debtor's experience and sophisticated understanding of the title

industry and the business operations of First American likewise establish that he would have

known the harmful impact of taking employees and clients from his employer.

In *Diamond v. Vickery (In re Vickery)*,[226] the debtor transferred investment funds from a

partnership to himself and others in a manner inconsistent with the partnership's anticipated share

of such funds. In affirming the bankruptcy court's finding of willful and malicious injury under §

523(a)(6), the district court held that debtor "acted with knowledge that the transfers were 'certain

to injure [the partnership] by depriving [it] of funds to which it was entitled.'"[227] The court also

found that the debtor's failure to disclose to investors that the partnership would be left with

insufficient funds supported an inference that the debtor knew his actions were not in the best

---

[225] *Id*. at 889.

[226] 526 B.R. 872 (D. Colo. 2015).

[227] *Id*. at 881.

interests of the partnership. Finally, the court found that the debtor knew that his actions "would result in the partnership being deprived of $3.6 million that rightfully belonged to it."[228] This is analogous to the Debtor's concealment of the formation of Northwest Title and his knowledge that taking employees and customers would result in a financial loss to First American.

For these reasons, the Court finds that the Debtor subjectively knew of the substantial certainty of injury to First American as a result of opening Northwest Title offices in First American's business locations and taking First American's employees and their customer contacts.

### D.    The Debtor's Actions Were Without Justification or Excuse.

The Debtor's defense to the § 523(a)(6) action is that he acted with justification or excuse.[229] Specifically, the Debtor asserts: (1) he formed Northwest Title for the purpose of creating a better employment opportunity for himself; (2) he did not intend to harm First American; and (3) at all relevant times, he believed he was not subject to the provisions of his Equity Employment Agreement, and this belief was supported by the advice of counsel.

For the following reasons, the Court rejects this defense. The Debtor argued both in the District Court Litigation and this adversary proceeding that he reasonably believed that the Equity Employment Agreement was no longer binding once Equity Title merged into First American. The Debtor also argued that at the time he resigned, he did not think he was subject to a non-compete or a non-solicitation clause in the Employee Handbook or the Code of Ethics. However, this Court is bound by the findings of the District Court Litigation. These include the following: (1) the

---

[228] *Id.*

[229] *State Farm Fire & Cas. Co. v. Edie (In re Edie)*, 314 B.R. 6, 15 (Bankr. D. Utah 2004) (citation omitted) ("in order for an act to be willful and malicious it must be a deliberate or intentional injury (willful) that is performed without justification or excuse (malicious).") (quoting *Am. First Credit Union v. Gagle (In re Gagle)*, 230 B.R. 174, 181 (Bankr. D. Utah 1999)). *See also Tinker v. Colwell*, 193 U.S. 473, 485–86 (1904) ("Malice, in common acceptation, means ill will against a person, but in its legal sense it means a wrongful act, done intentionally, without just cause or excuse.") (citation omitted).

Debtor's Equity Employment Agreement remained in force; (2) the Debtor received and had knowledge of the Employee Handbook and the Code of Ethics; and (3) the Debtor does not deny acknowledging the Employee Handbook and Code of Ethics. Based on these rulings, the Court will not consider the Debtor's assertion that he believed he was not bound by the Equity Employment Agreement or the terms of the Employee Handbook and the Code of Ethics.

The jury in the District Court Litigation also found that the Debtor "tortiously interfered with First American's contracts other than his own contracts." To prevail on this cause of action in the District Court Litigation, First American had to establish that the defendant intentionally interfered with the plaintiff's contracts, through an improper means, and thereby causing injury to the plaintiff.[230] A defendant employs an improper means when the actions "are contrary to law, such as violations of statutes, regulations, or recognized common-law rules."[231] The finding of an improper means is the functional equivalent of unexcused or unjustified interference.[232] Thus, under the preclusive effect of the District Court judgment, the Court finds that the Debtor was without justification or excuse for his actions that injured First American.

In summary, the Debtor argued that he did not intend to harm First American. But based on the totality of the facts regarding the Debtor's experience in the title industry; his understanding of the consequences to a title company's reputation and cash flow from the disruption of its business; his understanding of the issues of employees going to work for a competitor title company; his feelings of animosity towards First American; and his testimony at trial as to his knowledge of the substantial certainty of harm from taking employees and business from First

---

[230] *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194 (Utah 1991).

[231] *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 308 (Utah 1982) (overruled on other grounds by *Eldridge v. Johndrow*, 345 P.3d 553 (Utah 2015)).

[232] *C.R. Eng. v. Swift Transp. Co.*, 437 P.3d 343, 346-47 (Utah 2019) ("[A]n unexcused or unjustified interference is widely viewed as the functional equivalent of interference by an 'improper means' . . . .").

American; the Court finds that the Debtor subjectively knew that his actions were substantially

certain to cause harm, and thus that he acted with the requisite malicious intent under § 523(a)(6).

**E.    The Debtor's Advice of Counsel Defense Does Not Negate His Malicious Intent.**

The Debtor asserts that he lacked a malicious intent because his actions were based on a

reasonable belief that he was not bound by the Equity Employment Agreement. The Debtor further

asserts his belief was in good faith because it was supported by the opinion of an attorney.

Specifically, the Debtor spoke with Doug Smith about this issue, who consulted with the Wood

Balmforth law firm. Allegedly, Wood Balmforth opined to Doug Smith that the Equity

Employment Agreement ceased to be of legal effect after the merger with First American. Doug

Smith then communicated this opinion to the Debtor.

In the context of a nondischargeability action, the "advice of counsel" defense is explained

as follows:

> At its heart, the advice of counsel defense is not so much an affirmative defense as
> it is a way for a debtor to negate the element of intent. To meet his burden on the
> advice of counsel defense, [the debtor] must show (1) that all facts were fully and
> fairly communicated to counsel; (2) that counsel gave legal advice; (3) that [the
> debtor] relied on the legal advice; and (4) that [the debtor's] reliance was in good
> faith.[233]

The Debtor does not qualify for this defense. First, at the relevant times, Wood Balmforth

was not the Debtor's attorney.[234] Instead, Wood Balmforth was retained by Doug Smith to

represent Northwest Title. Second, the ostensible legal opinion of Wood Balmforth was

communicated to Doug Smith, and the Debtor only heard it second-hand from him. Third, it was

not established that Wood Balmforth had all of the relevant facts necessary to render an informed

---

[233] *Rupp v. Biorge (In re Biorge)*, 536 B.R. 24, 30 (Bankr. D. Utah 2015) (citations omitted).

[234] It was only after First American filed its District Court lawsuit that Wood Balmforth commenced its
representation of the Debtor.

opinion on the enforceability of the Equity Employment Agreement. Fourth, because the Debtor is an attorney with more than twenty years of experience in the title industry, it was not reasonable for him to accept what he heard second-hand from Doug Smith as the definitive word on the enforceability of the Equity Employment Agreement. Finally, the testimony established that the Debtor fully understood the risks of proceeding with his plans to form a directly competing title business while still employed at First American.

In the case of *United Orient Bank v. Green*, that likewise involved a § 523(a)(6) action, the court rejected the debtor's attempt to defend a very aggressive business strategy based on the advice of counsel: "[the debtor] knew that there was, at a minimum, a substantial risk that his actions were improper and elected to run that risk . . . [and the debtor] knew that his actions were 'contrary to commonly accepted duties in the ordinary relationships among people, and injurious to' plaintiffs."[235]

For these reasons, the Court rejects the Debtor's argument that he lacked a malicious intent based on his reliance on the alleged legal opinion of Wood Balmforth that the Equity Employment Agreement was no longer binding upon him when he formed Northwest Title.

**F.      The Amount of the Nondischargeable Debt.**

   *1.      The District Court Judgment.*

In the Adversary Complaint, First American seeks a judgment from the Bankruptcy Court determining that the entire District Court Judgment owed by Debtor to Plaintiff is nondischargeable based on Defendant's willful and malicious injury to First American. The Complaint does not set forth a dollar amount, but attached to the Complaint is the Special Verdict-

---

[235] *United Orient Bank v. Green*, 215 B.R. 916, 929 ( S.D.N.Y. 1997) (quoting *In re Stelluti*, 167 B.R. 29, 33 (Bankr. S.D.N.Y. 1994)).

Phase I from the District Court Litigation showing awarded damages in the total amount of $1,625,000 against the Defendant.[236] Further, in the Stipulated Pretrial Order, the parties agreed that the jury awarded the following damages in favor of First American and against the Debtor – $1,625,000 in total compensatory damages consisting of $500,000 on the breach of contract claim; $600,000 on the breach of fiduciary duty claim; and $525,000 on the tortious interference with contracts claim.[237]

As noted above, the District Court's final judgment established First American's claim against the Debtor. Issue preclusion thus prevents this Court from reconsidering the existence or the amount of First American's damage claim. Therefore, this Court will find that the damage award of $1,625,000 in favor of First American is nondischargeable under § 523(a)(6).

2.     *Attorney Fees and Costs Awarded by the District Court.*

First American also seeks a judgment from the Bankruptcy Court determining that the attorney fees and costs awarded to the Plaintiff by the District Court are likewise nondischargeable. As an initial matter, however, the Bankruptcy Court is unclear as to the amount of attorney fees and costs awarded by the District Court. The pleadings filed in this Adversary Proceeding contain conflicting amounts. In the Adversary Complaint, First American asks that "Plaintiff be awarded additionally [sic] fees, costs and interest in an amount to be determined by the Court."[238] In its Trial Brief, First American asserts that the District Court awarded First American attorney fees and costs in the total amount of $3,141,122.23: (1) $88,006.44 in attorney fees based on the Defendant's breach of fiduciary duty; (2) $2,802,344.52 predicated on the Defendant's breach of

---

[236] Adv. No. 17-02076, ECF No. 1, Exhibit A (Verdict).

[237] Adv. No. 17-02076, ECF No. 35; *supra* Part II.H.106-108.

[238] Adv. No. 17-02076, ECF No. 1.

contract; and (3) $250,771.27 in costs.[239] However, the stipulated Pretrial Order[240] states that "[t]he [District] Court granted an award of attorneys' fees and costs to First American and against Mr. Smith and others in the amount of $3,097,816.36."[241]

The Bankruptcy Court does not have in evidence and has not taken judicial notice of a copy of the District Court judgment(s) and/or orders awarding attorney fees and costs. First American did not include any of the pleadings in the District Court Litigation as proposed exhibits in the original Pretrial Order.[242] Rather than attempt to reverse engineer First American's attorney fees and costs, this Court will hold a supplemental hearing on the issue.

### 3.    Request for Post-Petition Post-Judgment Interest.

First American further asserts that it is entitled to post-petition post-judgment interest on the amount of the nondischargeable debt.[243] First American's Trial Brief does not provide a calculation of post-judgment interest. Therefore, the Court determines that a supplemental hearing is necessary to determine whether First American is entitled to post-petition post-judgment interest and if so, in what amount.

### 4.    Plaintiffs' Attorney Fees and Costs Incurred in this Adversary Proceeding.

It appears that in addition to the attorney fees and costs awarded in the District Court Litigation, First American is seeking attorney fees and costs incurred in connection with the

---

[239] Adv. No. 17-02076, ECF No. 40.

[240] Adv. No. 17-02076, ECF No. 35.

[241] Adv. No. 17,02076, ECF No. 35, para. 17; *supra* Part II.H.111.

[242] To remedy this issue, First American filed a Motion in Limine Requesting the Court Take Judicial Notice of Court Filings from this Court and the United States District Court for the District of Utah ("Motion in Limine"). Adv. No. 17-02076, ECF No. 28. First American later withdrew the Motion in Limine and the parties filed the Stipulated Pretrial Order that currently governs this matter. ECF No. 35. The Stipulated Pretrial Order appears to incorporate the District Court's ruling on attorney fees and costs in the Stipulated Facts. However, the amount of the attorney fees and costs awarded set forth in the Stipulated Pretrial Order is inconsistent with the amount set forth in First American's Trial Brief.

[243] Adv. No. 17-02076, ECF No. 40, First American's Trial Brief.

Adversary Proceeding before the Bankruptcy Court. The Court comes to this conclusion based on a sentence in First American's trial brief stating "[t]he Court should conclude that attorneys' fees incurred in connection with the same willful and malicious conduct is also non-dischargeable, *including those fees First American has had to expend in these proceedings*."[244] Again, the Court finds that a supplemental hearing is necessary on the issue of attorney fees and costs incurred in this Adversary Proceeding.

## IV.    CONCLUSION

This has been a difficult case for the Court as it is fully cognizant of the serious financial consequences that will flow to the Debtor as a result of this decision. The Court understands that the Debtor was frustrated with his situation at First American, and that the Debtor had the respect, confidence, and loyalty of many First American employees. Something that First American ostensibly failed to appreciate.

There is nothing *per se* malicious about the Debtor wanting to create a better career opportunity for himself and others. However, the Debtor's otherwise appropriate motivations crossed the line into malicious conduct when his business plan evolved into what was essentially a surprise attack on the operations of First American that involved intentionally concealing the formation of Norwest Title, poaching First American's essential employees and significant customers, and setting up offices in locations that were in direct competition with First American. The Debtor's actions are particularly problematic, and support the Court's finding of an intent to injure, given that the Debtor's formation of Northwest Title occurred when he was concurrently acting as First American's legal counsel. As such, the Debtor knew he had a fiduciary duty to avoid self-dealing and to act in the best interests of First American. As described above, the Debtor's

---

[244] *Id.* at p. 11.

conduct in this regard was wholly contrary to this duty, and the Debtor knew that his actions would injure First American.

Based on the foregoing, the Court finds that First American has carried its burden of proof by a preponderance of the evidence that the Debtor willfully and maliciously injured First American under § 523(a)(6). The Court will hold a supplemental hearing on whether and in what amounts the following should be included in the nondischargeable judgment: (1) attorney fees and costs awarded in the District Court Litigation; (2) post-petition post-judgment interest; and (3) attorney fees and costs incurred by the Plaintiff in this Adversary Proceeding. The Court will issue an order simultaneously with this Memorandum Decision.

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing MEMORANDUM DECISION FINDING THAT DEFENDANT'S DEBT TO PLAINTIFF IS NON-DISCHARGEABLE UNDER 11 U.S.C. § 523(a)(6) shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- Gregory J. Adams - gadams@mbt-law.com

- Tim Dance - tdance@swlaw.com, docket_slc@swlaw.com; snielsen@swlaw.com; csmart@swlaw.com

- Matthew L. Lalli - mlalli@swlaw.com

- Mark O. Morris - mmorris@swlaw.com, wkalawaia@swlaw.com; csmart@swlaw.com

- Jeremy C. Sink - jsink@mbt-law.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

None.